985 F.2d 553
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
THE FIRST SAVINGS BANK, FSB, Plaintiff-Appellant,
v.
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, INC.,
Defendant-Appellee.
 No. 92-1320.
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 27, 1992
Decided: February 8, 1993
 
 Appeal from the United States District Court for the District of South Carolina, at Greenville. Henry Michael Herlong, Jr., District Judge. (CA-90-287-6-20)
 Walker DuVall Spruill, TURNER, PADGET, GRAHAM & LANEY, P.A., Columbia, South Carolina, for Appellant.
 sThomas S. Schaufelberger, WRIGHT, ROBINSON, MCCAMMON, OSTHIMER & TATUM, Washington, D.C., for Appellee.
 Danny C. Crowe, TURNER, PADGET, GRAHAM & LANEY, P.A., Columbia, South Carolina; James K. Price, BOZE MAN, GRAYSON, SMITH & PRICE, Greenville, South Carolina, for Appellant.
 M. Joseph Sterner, DRINKER, BIDDLE & REATH, Washington, D.C.; Marshall Winn, WYCHE, BURGESS, FREEMAN & PARHAM, P.A., Greenville, South Carolina, for Appellee.
 D.S.C.
 AFFIRMED.
 Before HALL, WILKINSON, and LUTTIG, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 First Savings Bank (the "Bank") appeals a judgment on a jury's verdict entered in favor of defendant American Casualty Company in the Bank's action seeking indemnity under a fidelity bond for losses sustained in an investment scam. We affirm.
 
 I.
 A.
 
 2
 This case has 1980s trappings-reckless real estate ventures, investment fraud, and big losses for a savings and loan. Over $10 million is gone, and this case is the savings and loan's successor's attempt to recover $3 million under a fidelity bond.
 
 
 3
 Landbank Equity Corporation operated a sophisticated nationwide fraud during the mid-1980s. Landbank made second mortgage loans and then sold pools of the mortgages to savings and loans and other large investors, including the Federal National Mortgage AssociationMA. Typically, the investor would not actually take possession of the promissory notes and collect on them from the borrower; instead, it would pay Landbank a servicing fee for processing and servicing collection of the loans. In return, Landbank guaranteed timely "pass-through" of principal and interest. This guarantee was secured by private mortgage guaranty insurance (PMI).
 
 
 4
 Misrepresentation was the routine at Landbank. Though it promised investors that its lending and appraisal practices satisfied FNMA standards, it often lent money on "drive-by" informal appraisals. It ignored its promises not to loan more than 80% of the value of the collateral. Its violations of the Truth-in-Lending Act[1] made interest collection on many loans vulnerable to legal attack. In borrowers, creditworthiness was a welcome but unnecessary trait, because Landbank made most of its money up front-Landbank's fees for originating, processing, and closing a loan ran an astonishing 25-30% of the nominal amount financed. In sum, a typical Landbank loan and mortgage sale left (a) an uncreditworthy borrower with a lot less money than he "borrowed"; (b) a savings and loan paying, sight unseen, face or almost face value for the mortgage; and (c) Landbank with a tidy profit.
 
 
 5
 There were flaws in the scam, though. The riskiness of privatelybacked pools of mortgages forced Landbank to offer a high interest rate to investors so that they would not simply choose less risky government-sponsored mortgage securities. In addition, the loans had high default rates. Landbank confronted these hurdles in typical Ponzi fashion-it paid "principal and interest" payments to investors out of its fees for new loans, while falsely representing to investors and the PMI carrier that default rates were low. As in all Ponzi schemes, the pyramid could stand only so long as more and more new money could be attracted to an ever-widening base.
 
 B.
 
 6
 In three transactions between September 10, 1984, and March 1, 1985, the Bank's predecessor, First Federal Savings and Loan Association of South Carolina, purchased $21 million in Landbank mortgages. Landbank guaranteed a hefty 16% rate of return.
 
 
 7
 On January 16, 1985, the first sign of trouble appeared. Balboa Insurance Company, the PMI carrier for the underlying Landbank mortgages, sent a letter to the Bank alerting it that "a substantial number of loans described in the [insurance] certificates are not eligible for coverage." Balboa advised the Bank that it was reserving its right to deny coverage on some loans.
 
 
 8
 Balboa also enclosed copies of some of its previous correspondence with Landbank. The Bank should have found these enclosures very alarming. One letter complained to Landbank that its appraisals were too high, yielding an artificially low loan-to-equity ratio. In another, Balboa detailed the manner in which Landbank's up-front fees violated the Truth-in-Lending Act (these fees must be, but were not, included in calculation of the "annual percentage rate"). A third was Landbank's letter responding to the Truth-in-Lending inquiry, which repeatedly urges Balboa to keep its concerns private and not to notify investors. Finally, Balboa sent the Bank a letter from counsel for Balboa's parent company, which generally endorsed Balboa's opinion that Truth-in-Lending violations had occurred, and added that several state consumer protection laws had also been transgressed.
 
 
 9
 The Bank did not contact Balboa about this startling information. Instead, a Bank employee called Landbank, and was assured that Landbank's problems with Balboa were "of a political nature" and that Landbank was "in compliance with [the] master policy."
 
 
 10
 Balboa's "political" differences with Landbank escalated. In further correspondence directly to the Bank and other investors, Balboa stated that it would refund premiums, that Landbank had been uncooperative, and that Landbank had objected to its direct correspondence with investors.
 
 
 11
 Soon thereafter, Landbank notified investors that Balboa had been replaced as PMI carrier by the "Insurance Exchange of the Americas" (IEA). At the time, Balboa was rated "Ak" by the Best Insurance Guide; IEA, a newly created company, was not rated. On the verbal assurance of the Insurance Commissioner of Florida as to IEA's viability, the Bank agreed to the substitution of PMI carrier.
 
 
 12
 Even after its replacement by IEA as PMI carrier, Balboa continued to inform investors of its findings.[2] Nonetheless, the Bank never contacted Balboa directly.
 
 
 13
 In May, after learning that the South Carolina Department of Consumer Affairs was investigating Landbank, the Bank finally decided to look into matters itself. On June 6, 1985, C. L. Howell, a Bank vice-president, visited Landbank headquarters. Howell's written report[3] to the Bank's investment committee, though business-like in tone, was plainly intended to provoke concern. Howell found the visit "rather enlightening." He estimated that 2,900-3,000 accounts out of 9,000-9,500 were over eight days past due. He found it "interesting" to see that Landbank charged fees averaging 25-31% of the loan amount. In some instances, second mortgage loans had been made while the borrower was delinquent on a first mortgage. "Quite a few" loans lacked full appraisals.
 
 
 14
 Howell concluded that "these are not the kind of loans that we are interested in investing in." He then warned:
 
 
 15
 Landbank is generating new loans very rapidly each month. They are taking 25% to 30% in fees up front and then turning around and selling these loans in the secondary market. This creates the cash flow for them to make the monthly payments even when collection efforts are slow. This will work as long as the circle is maintained and none of the cash flow is stopped. If for some reason they cannot sell loans quickly enough on the secondary market, there is going to be a shut-down.
 
 
 16
 At the close of his letter, Howell advised that a 5-8% reserve be established to cover possible losses "if for some reason we still decide to go through with additional investments on Landbank loans."
 
 
 17
 The "shut-down" Howell predicted was close at hand. On June 15, 1985, nine days after Howell's visit, Landbank missed its monthly payment (approximately $700,000) to the Bank. A bank vicepresident called Landbank, which reported that it was having "computer problems." Landbank offered to make two payments, with accumulated interest, on July 15. The Bank agreed.
 
 
 18
 July 15 came, and Landbank made only one of its two payments. A Bank vice-president called Landbank. Marika Runnells, vicepresident of Landbank, confessed that Landbank was using mortgage collections (which it was obligated to "pass through" to investors) to pay for Landbank's internal operations. The Bank did nothing.
 
 
 19
 On August 15, no payment was made, leaving Landbank two months behind. Landbank soon went bankrupt, and the Bank lost approximately $10.6 million. Of this amount, only $1.279 million represented money actually remitted to Landbank but not passed through. IEA proved to have no assets, so the PMI was unavailable. Though the Bank took over direct servicing of the loans it had purchased, truth-in-lending violations, overblown collateral valuations, and the general uncreditworthiness of borrowers made collection difficult where not impossible.
 
 
 20
 In a last effort to recoup part of its loss, the Bank made a claim against its own fidelity bond for the bond's limit of $3 million. Unfortunately for the Bank, it had not notified the bond issuer-appellee American Casualty-until September 20, 1985. The bond required notice "at the earliest practicable moment" and in no event more than thirty days after "discovery" of a loss. "Discovery" was defined as awareness "of facts which would cause a reasonable party to assume that a loss covered by the bond had been or would be incurred, even though the exact amount or details of the loss may not then be known."
 
 
 21
 American Casualty denied coverage, and the Bank filed this suit to recover on the bond. Jurisdiction is based on diversity of citizenship, and the substantive law of South Carolina applies.
 
 
 22
 The district court ruled in limine that the Bank would not be permitted to introduce evidence of the lack of prejudice to American Casualty, because lack of prejudice does not excuse a late notice of claim under South Carolina law. After a seven-day trial, a jury returned a verdict for American Casualty.
 
 
 23
 The Bank's motion for a new trial was denied, and it appeals.
 
 II.
 
 24
 The Bank argues that the district court should have instructed the jury that, in the absence of prejudice to American Casualty, the late notice of claim would not defeat coverage.
 
 A.
 
 25
 The parties engage in a preliminary argument about whether the Bank had a duty to be diligent and investigate when facts arousing suspicion came to its attention; the Bank disclaims any such duty. We think the jury was properly instructed.[4]
 
 
 26
 A reasonable jury could easily have found that the Bank's notice was outside of the thirty-day requirement. When would a reasonable person have assumed that a covered loss had been or would be incurred? By June 16, the Bank (i) had the extensive correspondence from Balboa, (ii) had the report of its own vice-president describing Landbank's Ponzi scheme, and (iii) knew that Landbank had missed a $700,000 payment. If those facts were not enough, Landbank fell two full payments behind on August 15. Even then, the Bank waited more than thirty days before notifying American Casualty. A verdict based on strict application of the thirty-day notice provision would be unassailable.
 
 B.
 
 27
 The Bank, though, argues that the notice provision should not apply strictly. In its central argument on appeal, the Bank asserts that the district court should have permitted evidence to show that American Casualty was not prejudiced by the late notice and should have instructed the jury that a lack of prejudice would excuse the late notice.
 
 
 28
 The established South Carolina rule is that the time limits in an insurance contract are binding on the parties to the contract, and the insurer need not prove prejudice. Prior v. S.C. Medical Malpractice Liability Insurance Joint Underwriting Ass'n, 305 S.C. 247, 407 S.E.2d 655, 657 (App. 1991), cert. denied (Sept. 24, 1991) ("No rule of law is more firmly established in this jurisdiction than that one suing on a policy of insurance, where the notice required by the policy is not timely given, cannot recover"); Lee v. Metropolitan Life Insurance Co., 180 S.C. 475, 186 S.E. 376, 381 (1936) ("[T]he failure to give the required notice in the allotted time is fatal to the right of recovery, even if it be shown that the insurance company has suffered no harm from the delay"); Planter's Savings Bank v. American Surety Co., 177 S.C. 363, 181 S.E. 222 (1935). In Planter's Savings Bank, the South Carolina Supreme Court explained the long-term policy goal, transcending the result in any one case, it intends to further by its strict rule (181 S.E. at 224):
 
 
 29
 If [the notice provision's] terms are complied with in every instance, both banks and bonding companies would probably gain by the minimizing of losses; if not complied with, both would probably be losers thereby.
 
 
 30
 On the other hand, "innocent third parties" are permitted to recover their judgments against a tortfeasor's automobile liability insurance unless the insurer can show prejudice from its insured's failure to notify. Factory Mutual Liability Insurance Co. v. Kennedy, 256 S.C. 376, 182 S.E.2d 727 (1971). This rule likewise rests on a public policy judgment-expressed by the South Carolina legislature in financial responsibility and uninsured motorist statutes-that automobile liability insurance should be available to protect innocent victims of accidents. Id., 182 S.E.2d at 729.
 
 
 31
 The Bank acknowledges the cleanly drawn dichotomy of these longstanding precedents, but predicts that the first-party rule is about to change. In Humana Hospital-Bayside v. Lightle, 305 S.C. 214, 407 S.E.2d 637 (1991), the plaintiff had failed to notify his medical insurer within 48 hours of emergency hospitalization, as was required by the plan. The South Carolina Supreme Court held that plaintiff's challenge to strict application of the notice requirement was not properly before the court, but observed (407 S.E.2d at 639):
 
 
 32
 We recognize that there is a trend among several states to develop a relaxed interpretation of notice requirements in insurance contracts and apply a requirement of notice within a time consistent with the reasonable expectations of the parties.... However, we reserve ruling on the issue of whether the 48 hour notice requirement should be relaxed and the contract applied as only requiring notice within a reasonable time until the issue is properly before us.
 
 
 33
 We do not think that this neutral reservation indicates that South Carolina is about to abandon its prior rule. In fact, the question reserved does not even mention the "prejudice to the insurer" concept the Bank urges. Whether a 48-hour notice requirement in a policy of medical insurance ought to be enforceable at all is a much different question than whether a thirty-day notice provision in a commercial contract ought to be subject to ad hoc disregard.[5] We therefore agree with the ruling of the district court that, under South Carolina law, prejudice (or the lack of prejudice) to American Casualty is irrelevant.
 
 III.
 
 34
 A fidelity bond's purpose is to protect a bank from the dishonesty of its employees, though the bond in this case had a rider expanding the bond's reach to acts of "servicing contractors" such as Landbank. A fidelity bond is ordinarily not intended to protect a bank from ordinary business losses. In this regard, the American Casualty bond at issue expressly does not cover:
 
 
 35
 (e) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except where covered under Insuring Agreements (A)[fidelity of employees], (D) [forgery or alteration] or (E) [forged, altered, or stolen securities].
 
 
 36
 American Casualty argues, as it did to the jury, that all of the Bank's losses were ultimately attributable, directly or indirectly, to defaults on the underlying loans. Therefore, says American Casualty, it would be entitled to its judgment even if the Bank's failure to promptly notify it were excused.[6]
 
 
 37
 $1.279 million that was actually collected by Landbank on the Bank's accounts was never paid over to the Bank. The Bank asked for, but was not granted, a jury instruction that, as a matter of law, the $1.279 million was not subject to the loan loss exclusion. Instead, the court simply charged the exclusion's language and allowed the parties to argue their respective theories of the case.
 
 
 38
 American Casualty's theory was that Landbank's collapse was ultimately grounded on its failure to collect on loans. Because of the "guaranteed pass through" feature, the Bank would have suffered no loss but for Landbank's collapse, even if the individual loans sold to the Bank were nonperforming. Consequently, says American Casualty, all of the Bank's loss, including the $1.279 million collected but not remitted, was "indirectly" related to nonpayment of loans, and the loan loss exclusion applies.
 
 
 39
 Were we the trier of fact, American Casualty's argument would not convince us; on the other hand, it is good enough to avoid judgment as a matter of law. Therefore, we see no error in submission of the issue to the jury.
 
 IV.
 
 40
 Finally, the Bank complains that, after securing an order in limine excluding evidence of lack of prejudice, American Casualty was permitted to argue prejudice to the jury and to present deposition testimony as to prejudice. The deposition was read in full after the Bank introduced excerpts. We review such rulings on evidence for abuse of discretion, and we see no abuse here. Similarly, the jury argument of which the Bank complains did not provoke a contemporaneous objection, and we see no plain error.
 
 
 41
 The judgment is affirmed. Judge Luttig joins in the judgment.
 
 AFFIRMED
 
 
 [1]
 15 U.S.C. § 1601 et seq
 
 
 [2]
 Ironically, the first of these letters is dated March 1, 1985, the day of the Bank's final purchase of $10 million in Landbank mortgages. In this particular letter, Balboa reported that it was conducting an "intensive investigation" of Landbank, and that the records it had reviewed were "incomplete, contradictory and misleading."
 
 
 [3]
 This report is dated June 18, 1985, but Howell had orally reported his findings to his superiors on June 7. At that time, Bank vice-president Clark Ballard was "shocked" and "very upset" to learn that, contrary to Landbank's "representations," the loan documentation did not meet FNMA specifications. On June 10, Howell's immediate supervisor, executive vice-president Milton Alexander, reported to the Bank's Asset/Liability Committee that the Landbank loans were "lousy quality."
 
 
 [4]
 The district court refused the Bank's proposed instructions concerning its duty to investigate, which the Bank assigns as error. The court also refused American Casualty's proposed instructions imposing a strong duty of diligence on the Bank. In lieu of the parties' proposals, the district court chose to instruct the jury in an elegantly simple way-by charging the language of the bond itself. We find that this instruction adequately stated the pertinent legal standard. See Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir. 1987), cert. denied, 484 U.S. 1027 (1988) (instructions need not be technically accurate in every detail; test on appeal is whether the instructions as a whole "adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party"). The bond defines discovery in terms of the law's "reasonable person"-a ubiquitous character well known to lay jurors. The reasonable ostrich espoused by the Bank and the reasonable bloodhound on the watch for American Casualty are more obscure creatures who are not mentioned in the bond and whose presence in instructions may have confused the jury
 
 
 [5]
 Though we understand that denials of discretionary review have no precedential value, we note that the South Carolina Supreme Court denied certiorari in Prior less than two months after its decision in Humana HospitalBayside. Thus, the court passed up a prime opportunity to change the law in the manner the Bank predicts it will
 
 
 [6]
 The general verdict in favor of American Casualty compels us to examine the soundness of each theory of defense presented to the jury. Even if it would be fully supported by a proper theory, a general verdict must be set aside unless we are "reasonably certain" that the jury did not rely on an erroneously submitted theory. Harwood v. Partredereit AF 15.5.81, 944 F.2d 1187, 1192-1193 (4th Cir. 1991), cert. denied, 112 S.Ct. 1265 (1992)